UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
EMMANUEL CAYEMITTES,

                    Plaintiff,          15 CV 2364 (WFK) (RLM)

        -against-

THE CITY OF NEW YORK, HUGO
ORTEGA, SOPHIA CARSON, ADAN        **SECOND AMENDED COMPLAINT**
MUÑOZ, and JOHN DOE,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

      Plaintiff Emmanuel Cayemittes, by his attorneys Lumer & Neville, as and for

his Second Amended Complaint, hereby alleges as follows, upon information and belief:


### PARTIES, VENUE and JURISDICTION

      1.      At all times hereinafter mentioned, plaintiff Emmanuel Cayemittes was

an adult male resident of Kings County, within the State of New York.

      2.      At all relevant times hereinafter mentioned, defendant City of New

York ("New York City") was and is a municipal corporation duly organized and existing

under and by virtue of the laws of the State of New York and acts by and through its

agencies, employees and agents, including, but not limited to, the New York City Police

Department ("NYPD"), and their employees.

      3.      At all relevant times hereinafter mentioned, defendant Hugo Ortega,

Tax Number 935438, was employed by the City of New York as a member of the NYPD.

Ortega is sued herein in his individual capacity.

4.     At all relevant times hereinafter mentioned, defendant Sophia Carson, Shield 27627, was employed by the City of New York as a member of the NYPD.  Carson is sued herein in her individual capacity.

5.     At all relevant times hereinafter mentioned, defendant Adan Muñoz, Tax Number 935372, was employed by the City of New York as a member of the NYPD.  Muñoz is sued herein in his individual capacity.

6.     At all relevant times hereinafter mentioned, defendants John Doe was employed by the City of New York as a member of the NYPD.  The actual and complete identity of John Doe is not known to plaintiff at this time. John Doe is sued herein in his individual capacity.

7.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343, as well as 42 U.S.C. § 1983.

8.     Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq., in the Eastern District of New York, where the plaintiff and defendant City of New York reside, and where the majority of the actions complained of herein occurred.


**RELEVANT FACTS**

9.     On April 4, 2014, at or about 6:45 P.M., plaintiff was lawfully present on Riverdale Avenue near the intersection with Wyona Street, in Kings County, New York.

10.    Plaintiff had not been engaged in any criminal conduct, nor was he engaged in any conduct that could reasonably be viewed as criminal.

2

11.     Despite the absence of sufficient legal cause, defendants stopped and searched plaintiff.

12.     The defendants were on duty and assigned to the NYPD's Narcotics Bureau Brooklyn North ("NBBN").

13.     Defendant Adan Muñoz, who then had the rank of "Sergeant," was the supervising officer on the scene.

14.     One of the defendants grabbed plaintiff's face.

15.     One of the defendants, identified by defendant Ortega as Sergeant Muñoz, punched plaintiff in the face.

16.     The defendants assaulted plaintiff and he was struck and kneed several times.

17.     Although plaintiff was not in possession of any contraband or engaged in any criminal or unlawful conduct, he was handcuffed and taken into the defendants' custody.

18.     Plaintiff was placed in a police van and eventually transported to Kings County Hospital ("KCH") where he was diagnosed with various injuries, including two orbital fractures.

19.     Defendants, or members of the NYPD acting upon information supplied by one or more of the individual defendants, told KCH medical personnel that plaintiff had ingested crack cocaine at the time of this arrest.

20.     Medical personnel at KCH sought to determine whether plaintiff had

3

ingested any foreign objects containing or including one or more rocks of crack cocaine, as defendants had alleged, and following a scan of his abdomen, concluded that no such objects, meaning the crack defendants had alleged plaintiff had swallowed in their presence, were inside plaintiff.

21.     Plaintiff remained imprisoned by defendants throughout his stay at Kings County Hospital until on or about April 6, 2014.

22.     Plaintiff, still in defendants' custody, was eventually transported to Kings County Central Booking, where he was imprisoned until his arraignment.

23.     While plaintiff was imprisoned by the defendants, defendant Ortega completed arrest paperwork in which he stated that he personally observed crack cocaine in plaintiff's hand and that plaintiff then swallowed the crack cocaine in order to prevent the defendants from recovering it.

24.     Ortega further claimed that plaintiff resisted arrest by flailing his arms and otherwise engaging in conduct to prevent the defendants from handcuffing him.

25.     These claims were materially false and Ortega, and the other defendants, knew them to be false at the time they were made.

26.     Ortega forwarded these false allegations to the Kings County District Attorney ("KCDA") in order to justify the arrest and use of force against plaintiff, and to persuade the KCDA to initiate the plaintiff's criminal prosecution.

27.     The defendants knew and understood that plaintiff had been arrested and subjected to force, that there was no basis for the arrest of plaintiff, and that the force

4

used was unreasonable and excessive and had caused plaintiff to suffer visibly obvious facial injuries.

28.     The defendants also knew that Ortega, as the arresting officer, would be creating arrest paperwork that would contain lies, material omissions, and other fabrications designed to falsely create the impression that probable cause existed for plaintiff's arrest and to justify the defendants' use of force.

29.     The defendants also knew that Ortega would then forward this paperwork to the KCDA to try to persuade the KCDA to initiate the plaintiff's prosecution.

30.     The defendants knew and understood that the KCDA, in evaluating whether to commence a criminal prosecution against the plaintiff, would rely on the truthfulness of their factual claims and statements, and would proceed with the assumption that all of these factual statements and claims were truthful in all material respects, and that no material or exculpatory information had been withheld.

31.     As a direct result of these false allegations by the defendants, the plaintiff was criminally charged by the KCDA under docket 2014KN023887 with one count of attempted tampering with physical evidence under NY Penal Law §215.40(2), and one count of resisting arrest under NY Penal §205.30.

32.     Plaintiff was in defendants' custody from the time of his arrest on April 4 until his arraignment on April 7, 2014.

33.     At no time prior to plaintiff's arraignment did any of the individual defendants make any effort to correct, modify, or supplement the information Ortega

provided to the KCDA or otherwise advise the KCDA that the KCH examination had determined that plaintiff had not swallowed, ingested, hid within his body, or otherwise possessed, the narcotics which defendants claimed plaintiff possessed and for which plaintiff was arrested for possessing and attempting to tamper with by the KCDA.

34.     Although the attempted tampering charge was an E felony, the case was never presented to a grand jury and plaintiff was not indicted. However, plaintiff was required to return to court on threat of imprisonment.

35.     After multiple appearances, the charges against plaintiff were adjourned in contemplation of dismissal.

36.     The arrest of plaintiff was objectively unreasonable.

37.     At no time did there exist any basis to utilize any level of force against the plaintiff, much less the force actually employed, nor could any of the defendants have reasonably believed that such force was necessary.

38.     At no time did any of the defendants take any steps to intervene in, prevent, or otherwise limit the above mentioned misconduct.

39.     That at all times relevant herein, the defendants were on duty and acting within the scope of their employment, and their acts were done in furtherance of the City of New York's interests and without legal justification or excuse.

## FIRST CAUSE OF ACTION

### (§1983 Claims Against the Individual Defendants)

40.    Plaintiff repeats the preceding allegations as though stated fully herein.

41.    The individual defendants willfully and intentionally seized, searched, detained, and arrested plaintiff without probable cause, and without a reasonable basis to believe such cause existed.

42.    The individual defendants willfully and intentionally subjected plaintiff to physical force in excess of what was reasonable under the circumstances causing plaintiff to suffer physical injuries, by striking him, and did so without a reasonable basis to believe that such conduct was appropriate, reasonable, lawful, or necessary.

43.    The individual defendants deliberately forwarded fabricated evidence to justify and cover up the false arrest of, and use of excessive force against plaintiff, and forwarded said fabrications to the KCDA, resulting in the initiation and continuing of plaintiff's criminal prosecution and the deprivation of plaintiff's liberty.

44.    To the extent that any one of the individual defendants did not personally engage in the arrest of plaintiff without probable cause, or the fabrication of evidence concerning plaintiff's arrest, or the punching, kneeing, striking, or other uses of force against plaintiff, or any of the other unconstitutional conduct alleged herein, he or she witnessed this conduct as it occurred, was aware that it was occurring or would occur, had ample opportunity to intervene to prevent it from occurring or continuing to occur, and failed to do so.

45.     By so doing, the individual defendants subjected the plaintiff to (i) false arrest and imprisonment, (ii) excessive force, and (iii) the deprivation of his right to a fair trial through the use of fabricated evidence, and thereby violated and aided and abetted in the violation of plaintiff's rights under the Fourth, Sixth and Fourteenth Amendments of the United States Constitution.

46.     By reason thereof, the individual defendants have violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

## SECOND CAUSE OF ACTION

### (First Monell Claim Against the Municipal Defendant)

47.     Plaintiff repeats the preceding allegations as though stated fully herein.

48.     The individual defendants' false arrest and assault of plaintiff, as well as their fabrication of evidence against plaintiff to justify their unconstitutional conduct, and their failure to intervene or otherwise act to prevent or mitigate the harms being inflicted by their fellow defendants, were carried out in accordance with an existing plan or policy created or otherwise condoned by the municipal defendant designed to increase the number of arrests made without regard to probable cause.

49.     The purpose of this policy or plan was to generate large numbers of arrests to help the NYPD create a false impression of positive activity by their officers.

50.     In addition, members of the NYPD are evaluated, at least in part, on

the basis of their "activity" which is measured by the number of arrests made, search warrants secured, and other, similar criteria.  Thus, members of the NYPD routinely make arrests and engage in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

51.     The NYPD tracks the number of arrests made by each officer but, in evaluating its officers, does not take into account the outcome of these arrests, even though this information is available to the NYPD. As a result, officers are well aware that (a) they are being evaluated based on, in large part, the number of arrests made, and (b) their supervisors do not care whether these arrests lead to actual criminal prosecutions, much less convictions.

52.     More precisely, under this policy or plan, officers are encouraged or pressured to make as many arrests as possible, which has caused and will continue to cause, its officers, including the individual defendants and their colleagues, to make arrests regardless of whether there was any factual basis for the charges.  The officer(s) would then fabricate claims of having seen the person(s) being arrested in possession of weapons or illegal narcotics or otherwise engaged in criminal activity.

53.     The purpose of this policy or plan was to generate large numbers of arrests within the individual commands therein, in order to create a false or misleading impression of positive activity by their officers and satisfying internal quotas.

54.     In addition, members of the NYPD are evaluated, at least in part, on the basis of their "activity" which is measured by the number of arrests made, summonses issued, and other, similar criteria.  Members of the NYPD routinely make arrests and engage

in other police activity without sufficient legal cause in order to raise their levels of "activity" and improve the perception of their job performance.

56.     Upon information, this policy was in existence as of April 4, 2014, as codified in an October 17, 2011, Police Officer Performance Objectives Operation Order in which NYPD Commissioner Kelly directed all commands that, "Department managers can and must set performance goals" relating to the "issuance of summons, the stopping and questioning of suspicious individuals, and the arrests of criminals."

56.     Upon information and belief, that same Operation Order stated, "uniformed members. . . .Who do not demonstrate activities . . . or who fail to engage m proactive activities . . . will be evaluated accordingly and their assignments re-assessed."

57.     In the case of *Floyd v City of New York*, 813 F. Supp. 2d 417, 448 (S.D.N.Y.) on reconsideration, 813 F. Supp. 2d 457 (S.D.N.Y. 2011), United States District Judge Shira A. Scheindlin denied the City of New York's motion for summary judgment, in part, based on evidence that the NYPD had a widespread practice of imposing illegal stop and frisk, summons, and arrest quotas on officers. The evidence cited in *Floyd*, included testimony from various officers, audio recordings of roll call meetings in which precinct commanders issued orders to produce certain numbers of arrests, stops and frisks, and summonses, and a labor grievance on behalf of six officers and one sergeant who were transferred out of the same 75 precinct where plaintiff was arrested for allegedly failing to meet a ten summons-per-month quota.  In January 2006, a labor arbitrator found that this same 75 precinct had imposed summons quotas on its officers in violation of New York

State labor laws.

58.    In another Southern District of New York case, *Schoolcraft v. City of New York*, 10 CV 6005 (RWS), the plaintiff, a police officer assigned to Brooklyn's 81 precinct alleged that precinct commanders and supervisory personnel expressly imposed arrest and summons quotas, and explicitly directed officers to "arrest and summons fully innocent people" and then come up with a justification later.

59.    In 2012, Police Officer Craig Matthews commenced *Matthews v. City of New York*, 12 CV 1354 (BSJ) in the Southern District of New York, alleging that his complaints that the existing quota system was leading to unjustified stops and arrests, and thereby causing damage to the department's relationship with the local community led to his termination. There was little dispute that he made these complaints or that they were well founded. *See Matthews v. City of New York*, 779 F.3d 167, 169 (2d Cir. 2015).

60.    That this plan is still in effect is reflected in a class action suit apparently filed in August 2015 by various police officers alleging that the NYPD still requires officers to meet fixed numerical goals for arrests and court summonses each month, according to a New York Times article published February 18, 2016, which can be found online at http://nyti.ms/1R9FCGu.

61.    The policy or plan was kept in effect through the date of plaintiff's arrest, despite the municipal defendant's knowledge that county prosecutors were often not charging the individuals arrested, or otherwise not actively pursuing their prosecutions, or that there was insufficient evidence to justify the arrests and illegal searches, or that the

arresting officers were seeking to bolster the arrests with false allegations, and that the prosecutors often had found insufficient cause to justify the imposition of charges or continued prosecution if charges were filed.

62. Indeed, defendants Carson and Ortega were themselves sued in a case captioned *Smith, et al., v. City of New York, et al.*, 14 CV 5841 (MKB) (VMS), in the Eastern District of New York, in which the three plaintiffs alleged that, in November 2013, multiple officers, led by Sophia Carson, had obtained a search warrant for their apartment based on fraudulent or deliberately inaccurate information, executed the warrant, and caused the plaintiffs, to be arrested on narcotics charges fabricated by, in part, Carson and Ortega. The plaintiffs were detained for one day and the charges were declined, in part, and then dismissed. The defendants caused a child neglect petition to be filed, but the children were never removed from the home and the petition was dismissed. The City resolved that case by paying the three plaintiffs $180,000.

63. Neither Carson nor Ortega, nor any other person involved in the arrest and prosecution of these plaintiffs, and two other individuals as well, were disciplined in any way or otherwise held accountable for their conduct.  Indeed, Carson received credit for initiating an investigation that resulted in five arrests, which the NYPD considers a successful operation, regardless of how it was carried out, or the fact that the only prosecutions that actually flowed from these arrests were dismissed on the merits, and the City was forced to expend significant money to avoid further litigation.

64. According to Pacer, other cases in which Hugo Ortega is a named

defendant that are or were pending in the Eastern District of New York include, *Racks, et al.,*
*v. City of New York, et al.*, 11 CV 2305 (WFK) (RML) (allegations of excessive force, including
attempted murder, false arrest, and other misconduct, as well as a Monell claim against the
municipal defendant, which remain pending as of the date of this motion); *Hunter v. City of*
*New York, et al.,*, 12 (NG) (RML) (alleging, in part, false arrest, excessive force, and malicious
prosection (settled)); *Singleton v. City of New York, et al.*, 12 CV 4175 (JBW) (LB) (alleging, in
part, false arrest and unlawful strip search (settled)); *Morris, et al., v. City of New York, et al.*, 12
CV 6360 (CBA) (JMA) (alleging, in part, false arrest, excessive force, malicious prosecution,
and denial of a fair trial). While *Racks* appears to still be pending, all of the other cases have
settled.

65.     These cases are but a small, small drop in the ocean of civil rights cases
against members of the NYPD in which plaintiffs are claiming that they were falsely arrested
and imprisoned or prosecuted based on fabricated evidence.

66.     More generally, according to an article in New York Magazine, dated
October 10, 2014, the City of New York issued a report reflecting that it paid an average of
$33,875 per case to resolve well over 10,000 cases between 2009 and 2014, and that figure
did not take into account filed cases that were still pending when the report was compiled.
Similarly, the City Comptroller has reported that the City of New York's payments to resolve
allegations of misconduct by members of the NYPD had risen from $99 million to $217
million in between 2005 and 2014, as stated on Page 2 in the Comptroller's August 2015
report at http://nylawyer.nylj.com/adgifs/decisions15/083115claims.pdf. While such

numbers relate to the NYPD as a whole, they reflect that the City had actual knowledge that its police department was routinely engaging in unconstitutional and unlawful conduct, at least some of which can be attributed to a strict quota policy that compelled officers to focus on the quantity of their arrests at the expense of making good arrests.

67.     In October 2011, following a criminal bench trial in New York Supreme Court, Kings County, under indictment number 06314-2008, former NYPD narcotics officer Jason Arbeeny was convicted of planting drugs on two individuals and falsifying arrest reports. Before issuing a verdict of guilty, the trial judge scolded the NYPD for what he described as a "widespread culture of corruption endemic in its drug units." The judge further stated that the testimony demonstrated that the NYPD narcotics divisions maintain a "cowboy culture" and that he was "shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed."

68.     In an Order dated November 25, 2009, in *Colon v. City of New York,* 09-CV-0008 (E.D.N.Y.), the Hon. Jack B. Weinstein stated:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration -- through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department -- there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

69.     It is thus manifestly clear through the litigation brought in the Eastern and Southern Districts of New York, as well as the many cases filed in New York's State courts, that thousands of civilians have alleged that members of the NYPD have deliberately arrested them without probable cause.  Thus, even if the municipal defendant was not the architect of the policies and routinized conduct causing these unlawful arrests, it was certainly on notice of the practice, and by failing to take any meaningful corrective steps, has ratified, endorsed, or otherwise communicated its acceptance of this policy to the officers it employs.

70.     Rather than take meaningful steps to reduce and eliminate such misconduct by its officers, the City of New York and the NYPD have instead affirmatively announced a renewed commitment to defending such misconduct. In an article in the New York Times on February 4, 2016, the link to which is http://nyti.ms/1nPv0mO, the City proudly announced that the NYPD had "created a new 40-member legal unit that develops evidence that the Law Department can use to defend lawsuits against the police, and the [Law Department] hired about 30 lawyers to bolster its litigation teams and to try more cases in court."  According to this article, these steps were warmly received by police union leaders.

71.     The City's stated response to the wave of litigation caused by misconduct on the part of the NYPD is thus directed not at the deliberate and frequent constitutional violations underlying the consequential litigation, but rather at defending such misconduct so that officers can continue to engage in unconstitutional conduct without fear

of being sued or held accountable.  In so doing, the City has dispensed altogether with any

pretense that such misconduct is not sanctioned, ratified, or otherwise endorsed by the City

of New York and the NYPD's executive leaders and supervisory personnel.

72.     It is therefore clear that the municipal defendant has not only tolerated,

but actively fostered a lawless atmosphere within the NYPD and that the City of New York,

at the bare minimum, has been on notice of, and remained deliberately indifferent to, the risk

that the undue emphasis on arrest quotas, or minimum activity levels, particularly when

coupled with a decidedly and deliberately indifferent level of supervision, would lead to the

violation of individuals' constitutional rights in general, and the violation of plaintiff's rights

in particular.

73.     By reason thereof, the municipal defendant has violated 42 U.S.C.

§1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish,

incarceration and the deprivation of liberty, and the loss of his constitutional rights.


### THIRD CAUSE OF ACTION

**(Second Monell Claim Against the Municipal Defendant)**

74.     Plaintiff repeats the preceding allegations as though stated fully herein,

including the allegations set forth in the Second Cause of Action.

75.     Not only has the municipal defendant effectively ratified such

misconduct by NYPD members generally, the foregoing violations of plaintiff's federal

constitutional rights and injuries were further directly, foreseeably, proximately, and

substantially caused by conduct, chargeable to the defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including plaintiff, who are subjected to excessive force and other misconduct by officers whom the NYPD know have a demonstrated history of such misconduct.

76.     The municipal defendant was on notice prior to April 4, 2014, that defendant Adan Muñoz had a history of engaging in misconduct, including, but not limited to, unlawful actions and otherwise unjustified acts of violence, based on events that occurred after Muñoz had been hired by the NYPD.  Notwithstanding such notice, the NYPD failed to take any meaningful supervisory action or otherwise reasonably respond to Muñoz's conduct, covered up his further misconduct, and left Muñoz in place to continue his pattern and practice of unconstitutional behavior.

77.     According to Pacer, Adan Muñoz has been named in several federal lawsuits in this district, including *Bell, et al., v. City of New York, et al.*, 14 CV 04585 (ENV) (CLP) (alleging, in part, excessive force towards multiple plaintiffs); *Dunn v. City of New York*, 14 CV 5911 (FB) (VMS) (alleging, in part, unlawful search and seizure); *Rodriguez v. City of New York, et al.*, 15 CV 793 (RRM) (RML) (alleging, in part, unlawful search and seizure, threats of violence, false arrest); *Giles, et al., v. Spataro, et al.*, 15 CV 893 (ENV) (LB) (alleging, in part, excessive force, unlawful entries into plaintiffs' residences, false arrest, and denial of a fair trial through the use of fabricated evidence); *Whitney v. City of New York, et al.,* 15 CV 5176 (AMD) (VMS) (alleging, in part, false arrest, excessive force, denial of a fair trial through the fabrication of evidence, malicious prosecution, and an unlawful search).

78.     According to the allegations in a Verified Complaint filed in New York State Supreme Court, Kings County Civil Term, in the matter captioned *Lacey Berry v. City of New York, et al.*, Index 00728/2015, in January 2014, more than two months prior to assaulting plaintiff, Muñoz subjected Lacey Berry to racial epithets, directed another officer to assault Berry, and then personally battered Berry, causing Berry serious injuries, including a facial fracture. A copy of the Summons and Complaint as retrieved from the Kings County Clerk is annexed hereto as Exhibit 1 and is incorporated by reference.

79.     More precisely, Berry alleges that he was arrested by Muñoz and officers working under his supervision, and that Muñoz called Berry a "nigger," expressly directed another officer to "kick his fucking ass," and then watched approvingly as the other officer assaulted Berry. Later, after arriving at a local police precinct station house, Muñoz assaulted Berry while he was seated and wearing handcuffs, struck him multiple times, broke Berry's nose, and knocked him unconscious.

80.     Berry further alleges that Muñoz has a long history of complaints since he joined the NYPD in 2004, including:

a.     In April 2005, a complaint for using offensive language was made against Muñoz. Exh. 1 at ¶ 161.

b.     In May 2005, it was alleged that Muñoz threatened to damage and seize property. Exh.1 at ¶ 162.

c.     In September 2005, Muñoz was accused of conducting an improper stop, frisk and search and being discourteous. Exh.1

at ¶ 163.

d.      In May 2007, Muñoz was again accused of an improper stop
        and search, as well as use of force, threats, discourtesy and
        threat of arrest. Exh.1 at ¶ 164.

e.      In November 2008, a complaint against Muñoz was made
        alleging that the complainant's vehicle was improperly stopped,
        the occupant improperly searched, and the vehicle illegally
        searched. Exh.1 at ¶ 165.

f.      In December 2008, Muñoz was again accused of an improper
        vehicle stop and search, discourtesy and use of physical force.
        Exh.1 at ¶ 166.

g.      In March 2009, another individual accused Muñoz of use of
        force, discourtesy, abuse, refusing to provide his name and
        shield, and an illegal stop. Exh.1 at ¶ 167.

h.      Later that same month, Muñoz was accused of discourtesy,
        offensive language, and threatening to issue a false summons.
        Exh.1 at ¶ 168.

i.      In May 2011, Muñoz was again accused of using excessive force.
        Exh.1 at ¶ 169.

81.     Muñoz was placed on Force Monitoring Level 1 due to the number of
CCRB complaints filed against him within a one-year period. Exh. 1 at ¶ 155.

19

82.     In all, there were 32 charges filed with the Civilian Complaint Review Board against Muñoz between 2005 and 2014, not including any charges concerning the alleged assault on Lacey Berry or the assault on plaintiff, or any other charges filed and investigated by the Internal Affairs Bureau. Exh.1 at ¶ 170.

83.     According to Berry, Muñoz's threats and acts of violence were directed at family members as well as citizens.

84.     For instance, it is alleged, upon information and belief, that in 2007 Muñoz threatened his spouse and made suicidal threats and was placed on modified duty. Exh. 1 at ¶ 152.

85.     It is further alleged that there were other, similar incidents, one of which resulted in the issuance of an order of protection, as well as an investigation into allegations that Muñoz had endangered the welfare of a minor, and on at least one other occasion Munoz was again placed on modified duty.  Exh. 1 at ¶¶ 153-154, 157-158.

86.     Notwithstanding this above history of violence, as well as other events, not expressly identified herein, the City of New York not only continued to employ Muñoz, but in fact promoted him to Sergeant in or about November 2009.

87.     The City of New York's occasional short-term punishments, with no long-term consequences, served only to reflect the municipality's awareness of Muñoz's continuing misconduct. Any remedial aspect of these temporary measures was undermined every time he was summarily returned to active duty. Nothing about these relatively minor and brief disciplinary actions had any deterrent effect on Muñoz, as the City was well aware,

given Muñoz's continued violence and misconduct through his assault on plaintiff on April 4, 2014, and yet the NYPD took no further action.

88.     In fact, the NYPD's response to the assault on plaintiff in this case is itself compelling evidence of the City's deliberate, ongoing, and systemic efforts to cover up this sort of misconduct.  More precisely, the NYPD affirmatively sought to cover up both Muñoz's initial misconduct and his co-workers' complicity therein, and in so doing, communicated its approval of the very misconduct at issue.

89.     In this case, on April 5, 2014, less than three months after Muñoz's violent battering of the handcuffed and prone Lacey Berry, and one day after Muñoz's assault on the plaintiff, the NYPD's Internal Affairs Bureau ("IAB") opened an investigation into Muñoz, Ortega, and Carson, to determine, in relevant part, if unnecessary force was employed against plaintiff during his arrest. All three defendants were subjects of said investigation.

90.     The investigation was referred to IAB Group 54, the unit assigned to investigate all unnecessary force complaints city-wide. The commanding officer of Group 54 is Deputy Inspector Charles Barton.

91.     Upon information and belief, by the time IAB Group 54 opened its inquiry into the force used against plaintiff, it had already opened an investigation into allegations concerning the alleged assault on Lacey Berry by Muñoz and one or more officers in his command three months earlier.

92.     Upon information and belief, the investigation into the Berry

allegations as well as those by plaintiff concerning the conduct of Muñoz and officers under his supervision overlapped and were concurrently pending before Group 54 investigators, who surely must have been aware of this fact.

93.     Plaintiff stated to IAB that one of the male officers – meaning either Muñoz or Ortega – had punched him in the left eye, and that the officers also struck him when he was on the ground.  By the time plaintiff made such statements to IAB, the investigators were already aware that plaintiff had suffered two fractures to his left eye socket.

94.     Carson was interviewed by IAB on May 14, 2014, at which time she stated, in relevant part, that she did not punch or strike plaintiff in the face, or see anyone else do so.  Carson could not account for plaintiff's injuries.

95.     Muñoz was interviewed by IAB on July 1, 2014, and he too denied punching or striking plaintiff in the face, or seeing any other officer do so. Like Carson, Muñoz could not account for plaintiff's injuries but speculated they occurred when he was brought to the ground by the defendants.

96.     Ortega was the arresting officer, the author of the arrest paperwork, and the person who communicated with prosecutors as to plaintiff's alleged possession of narcotics and, more importantly, his purported resisting arrest.  He was never interviewed.

97.     On July 31, 2014, the investigating officer for IAB was advised by IAB Deputy Inspector Barton, the Commanding Officer of Group 54, which was overseeing the investigation, to close said investigation and not to conduct any further interviews, even

though Ortega had not been questioned or interviewed.  Accordingly, IAB did not conduct a formal interview of Ortega. IAB's records of this investigation offer no clue as to why this investigation was suddenly and immediately terminated, or why IAB decided that Ortega's statement should not be taken.

98.      Instead, on August 10, 2014, the investigator memorialized that the charges of unnecessary or excessive force were to be deemed "unsubstantiated." This finding was reached, according to IAB, because the conflict between the plaintiff's claim that an officer had punched him in the face could not be reconciled with the denials by Carson and Muñoz that this had happened, making it "impossible to clearly prove or disprove the . . . Unnecessary Force allegation levied against the subject officers."  IAB supervisors endorsed the finding days later.

99.      Nowhere in IAB's explanation as to why it was deeming the allegations unsubstantiated was there any discussion of the incident involving Lacey Berry, or any other allegation of any sort of misconduct by Muñoz or the other subjects of the investigation.

100.     In fact, IAB determined that there was "no pattern of misconduct" on the part of Muñoz, notwithstanding the current allegations by Berry or any other prior allegation against Muñoz.  When pressed at his deposition, D.I. Barton could not offer a definition of the term "pattern of misconduct" and admitted that the term had no objective definition in IAB, or at least as the term was applied in Group 54.

101.     Rather, IAB concluded that while plaintiff was certain he had been punched in the face, Carson and Muñoz flatly denied it had happened. Confronted with

these two opposing views, IAB decided it was unable to resolve the matter.  While Hugo

Ortega, the arresting officer and author of the arrest paperwork, may have been able to

contribute to this inquiry, IAB suddenly, and inexplicably, closed the investigation without

taking a statement from Ortega.

102.    In fact, Ortega has since testified under oath that he saw Muñoz punch

plaintiff in the left side of his face; a blow that Ortega acknowledged sent plaintiff to the

ground and directly implicates Muñoz and makes clear that he and Carson lied to IAB.

103.    Had IAB taken this statement from Ortega, the NYPD would have

been forced to acknowledge that Muñoz had once again used serious and dangerous violence

against a civilian, that Muñoz and Carson had lied to IAB to cover up this act of violence,

and that the defendants had failed to accurately and truthfully report this use of force.

104.    Barton has since testified that he has no recollection as to why he

ordered the investigation terminated, nor can he identify any materials that might help him

remember why he undertook this action.

105.    IAB's inexplicable decision not to interview Ortega is compelling

evidence of the NYPD's deliberate attempt to avoid memorializing Ortega's version of

events in order to protect Muñoz and Carson from Ortega's anticipated testimony.

106.    At the time of the incident and subsequent investigation, Carson and

Ortega were friends and Carson's husband, Lawrence Carson, was a Sergeant with the

NYPD who was assigned to IAB.

107.    That IAB was alerted to Ortega's anticipated testimony is evinced by

IAB's sudden truncation and closure of the investigation following several months of active investigation, as well as Barton's failure to document the basis for his decision and his accompanying memory failure. IAB's expectation that Ortega would implicate Muñoz provides the only rational explanation for IAB's decision to forego an interview of Ortega, who was not only the subject of the investigation but also the arresting officer and author of the arrest paperwork.

108.   In addition, the municipal defendant has long been aware that Hugo Ortega, while represented by the Law Department, testified under oath in February 2015 that he saw Muñoz punch plaintiff in the face with his fist during the arrest. Ortega testified again in January 2016 and again stated under oath that he witnessed Muñoz punch plaintiff in the face during the arrest and knock him down.

109.   Yet, despite the fact that Ortega's unambiguous testimony confirms, at a minimum, that Muñoz used the force as plaintiff alleged, and that he and Carson gave false statements to IAB to cover up this conduct, IAB has made no effort to revisit this investigation or otherwise address Ortega's testimony or the other defendants' previous statements to IAB.

110.   Barton has since testified that he had no interest in revisiting plaintiff's allegations, and testified that there was no inconsistency between the testimony as he assumed that if Muñoz had indeed punched plaintiff as alleged, and as Muñoz denies, Muñoz must have simply forgotten that he had done so while he was testifying. That Muñoz had lied about it because he knew he was in the wrong was apparently out of the question.

111.     IAB's refusal to interview a critical witness who would inculpate Muñoz and Carson, and refusal to consider post-hoc evidence that these officers lied, is but further evidence of the City of New York's policy and practice of permitting, if not encouraging misconduct by its officers generally, and Muñoz in particular, either overtly, or by failing to punish misconduct, or otherwise acting to cover up, legitimize, or sanctify this behavior, and in so doing announces its continuing ratification of this policy.

112.     Such actions by the City of New York are a reflection of the municipal defendant's repeated and untenable abdication of its responsibility to supervise and discipline its employees, and to otherwise protect the public from officers whom the NYPD knows are a threat to the public's safety and well being, and evince a complete disregard and deliberate indifference to the rights and welfare of those with whom these officers, and Muñoz in particular, interact.

113.     These actions further reflect a policy, custom, and practice, or a ratification thereof through a demonstrated failure to act to curtail such behavior, and thus the aforesaid policies, procedures, regulations, practices and/or customs of the municipal defendant were, collectively and individually, a substantial factor in bringing about the aforesaid constitutional violations by the individual defendants generally, and Muñoz in particular.

114.     By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

WHEREFORE, the plaintiff demands judgment against defendants jointly and severally as follows:

i.      on the first cause of action, actual and punitive damages in an amount to be determined at trial;

ii.      on the second and third causes of action, actual damages in an amount to be determined at trial;

iii.      statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and New York common law, disbursements, and costs of the action; and

iv.      such other relief as the Court deems just and proper.

Dated:    New York, New York
March 4, 2016

LUMER & NEVILLE
Attorneys for Plaintiff

By: _____
Michael Lumer, Esq.
225 Broadway, Suite 2700
New York, New York 10007
(212) 566-5060